# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WESTSIDE MOTHERS, et al.,

      Plaintiffs,

v.                                 Case No. 99-CV-73442-DT

JANET OLSZEWSKI, et al.,

      Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' NOVEMBER 19, 2004 "MOTION TO DISMISS AND/OR [FOR] SUMMARY JUDGMENT"

This matter is before the court on Defendants' November 29, 2004 "Motion to Dismiss and/or [for] Summary Judgment."  This is Defendants' second motion to dismiss the case.  On March 26, 2001, this court issued a detailed written order granting Defendants' original motion to dismiss based on a lack of jurisdiction and want of a cause of action.  *Westside Mothers v. Haveman*, 133 F. Supp. 2d 549 (E.D. Mich. 2001).  Plaintiffs appealed and, in an opinion dated May 15, 2002, the Sixth Circuit Court of Appeals reversed.  *Westside Mothers v. Haveman*, 289 F.3d 852 (6th Cir. 2002).

The court of appeals, after revoking its first mandate, issued an amended mandate on August 31, 2004.  This court re-opened the case on its docket and, on October 4, 2004, conducted an in-person scheduling/status conference with the attorneys remaining in the case.  During the October 2, 2004 conference, counsel for Defendants expressed a desire to file a motion to dismiss based in large part on the United States Supreme Court's intervening decision in *Gonzaga University v. Doe*, 536

U.S. 273 (2002). Plaintiffs' counsel also indicated a desire to file an amended complaint. The court subsequently permitted Plaintiffs to file their "First Amended Complaint" on October 18, 2004 and stayed discovery in this case pending review of Defendants' anticipated and potentially dispositive motion to dismiss.

Defendants' motion has been fully briefed and the court held oral argument on the motion February 2, 2005. For the reasons set forth below, the court will grant in part and deny in part Defendants' motion.

## I. BACKGROUND

This is a civil rights case brought against Michigan state officials for their alleged failure to provide eligible Michigan children with medical, dental, developmental, and mental health services under the federal Medicaid statute. Plaintiffs claim that Defendants are denying Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") services to eligible Medicaid recipients under age 21.

Plaintiffs bring this 42 U.S.C. § 1983 action against Janet Olszewski in her official capacity as Director of the State of Michigan Department of Community Health and Paul Reinhart in his official capacity as Deputy Director of the State of Michigan Medical Services Administration. Plaintiffs Westside Mothers, Families on the Move, Inc., the Michigan Chapters of the American Association of Pediatrics and of Pediatric Dentists, along with five named individual Plaintiffs allege violations of their federal statutory rights secured under the federal Medicaid statute 42 U.S.C. §§ 1396a(a)(8), (a)(10), (a)(30)(A), and (a)(43) as defined by 42 U.S.C. §§ 1396d(a) & (r) and 1396u-2(b)(5). (*See* Pl.'s First Amend. Compl. at ¶ 2.) Plaintiffs also have filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23.

2

Plaintiffs seek declaratory and injunctive relief asking the court to find unlawful Defendants' policy and practice of denying Plaintiffs (and the asserted class) health services to which they are entitled under the statute.  (*Id.* at 26.)  Plaintiffs also ask the court to appoint a Special Master to oversee an injunction requiring Defendants to remedy their past statutory violations.  (*Id.* at 25-26.)

There is no dispute that the Medicaid statute at issue is spending clause legislation.  "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals."  *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990). The Medicaid program, Title XIX of the Social Security Act, was created in 1965 and "provides a federal subsidy to states that choose to reimburse poor individuals for certain medical care."  *Westside Mothers*, 289 F.3d at 855.  "Although participation in the program is voluntary, participating states must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services."  *Wilder*, 496 U.S. at 502.  States participate in the program through "State plans for medical assistance" that are submitted to and approved by the Secretary of Health and Human Services.  42 U.S.C. § 1396; *see also* 42 C.F.R. § 430.10.  A state that fails to comply with its approved medical assistance plan and certain federal requirements runs the risk of having the Secretary revoke its funding.  42 U.S.C. § 1396c.

Michigan has elected to participate in the Medicaid program.  It operates under a waiver from the Health Care Finance Administration, providing eligible individuals Medicaid services by requiring them to enroll in Health Maintenance Organizations

("HMOs"), also known as managed care entities ("MCEs").  *See* 42 U.S.C. § 1396u-2(a)(1)(A)(i) (states may "require an individual who is eligible for Medicaid under the state plan . . . to enroll with a managed care entity ["MCE"] as a condition of receiving such assistance").  A medicaid managed care entity "provides or arranges for services for enrollees under a contract . . . pursuant to [42 U.S.C. § 1396b(m)]."  42 U.S.C. § 1396u-2(a)(1)(B)(i).  All of the individually named Plaintiffs are enrolled in a MCE.

Plaintiffs' First Amended Complaint comprises three counts.  Count I is titled "Failure to Provide Healthcare to all Eligible Children," alleging a breach of 42 U.S.C. § 1396a(a)(8) and (a)(10) as defined by 42 U.S.C. § 1396d(a) & (r).  Count II is titled "Failure to Deliver Access to the Children's Healthcare Services Required by Title XIX," alleging a breach of rights created under 42 U.S.C. § 1396a(a)(30)(A), as defined by § 1396u-2(b)(5).  Count III is titled "Denial of Basic Child Healthcare Outreach and Information" and alleges a violation of 42 U.S.C. § 1396a(a)(43)(A) as defined by § 1396d(a) and (r).  All of these counts are brought pursuant to 42 U.S.C. § 1983.

Defendants argue that Count I should be dismissed because: (1) the statutory provisions relied on by Plaintiffs do not create individual federal rights enforceable under 42 U.S.C. § 1983.  *See Blessing v. Freestone*, 520 U.S. 329 (1997); *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002); (2) 42 U.S.C. §§ 1396a(a)(8) and (a)(10) do not create an obligation for the State to provide actual medical services and therefore forecloses the remedy sought by Plaintiffs; (3) Plaintiffs have no individual federal enforceable right to ensure full or substantial compliance with the Secretary's participation goal established pursuant to 42 U.S.C. § 1396d(r); (4) there is no genuine issue of material fact that Michigan's Medicaid program, policies, and procedures

4

provide for all EPSDT screening services as required by federal law; and (5) because a claim that a Medicaid provider failed to provide covered services completely or adequately does not state a claim against the state officials under § 1983.

Defendants argue that Count II should be dismissed because neither 42 U.S.C. § 1396a(a)(30)(A) nor § 1396u-2(b)(5) create enforceable rights under § 1983.

Lastly, Defendants argue that Count III should be dismissed because no Plaintiff has alleged that he lacked information about the availability of EPSDT services and that there is no genuine issue of fact on this claim because Defendants do provide for informing all eligible Medicaid recipients under age 21 of the availability of EPSDT services as required by 42 U.S.C. § 1396a(a)(43) and described in § 1396d(r).  In short, Defendants argue that Plaintiffs fail to state a claim because none of them have alleged that they had been determined eligible but were denied notice.  Defendants further argue that Plaintiffs' complaint erroneously relies on an "effectiveness" requirement not contained within § 1396a(a)(43).

## II.  STANDARDS

### A.  Rule 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief.  *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996); *Kline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996); *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995).  A motion to dismiss may be granted "only if it is clear that no relief

5

could be granted under any set of facts that could be proved consistent with the allegations." *Pratt v. Ventas, Inc.,* 365 F.3d 514, 519 (6th Cir. 2004) (internal quotation marks and citation omitted). When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993); *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations. *Wright*, 58 F.3d at 1138; *Columbia Natural Resources, Inc.*, 58 F.3d at 1109.

Though decidedly liberal, this standard of review does require more than the bare assertion of legal conclusions. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996); *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1100-01 (6th Cir. 1995). The complaint must give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994); *Johnson v. City of Detroit*, 319 F. Supp. 2d 756, 759-60 (E.D. Mich. 2004).

"In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'" *Lillard*, 76 F.3d at 726 (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)). "In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Amini v. Oberlin*

*College*, 259 F.3d 493, 502 (6th Cir. 2001) (emphasis omitted) (citing *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997)).

## B.  Rule 56

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.  *See id* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

7

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party.  *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  The court is not to weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III.  DISCUSSION

### A.  Rights Enforceable Under 42 U.S.C. § 1983

All of Plaintiffs' claims employ 42 U.S.C. § 1983 as an enforcement vehicle.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws*, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).

Section 1983 does not create substantive rights; it merely serves as a vehicle to enforce deprivations of "rights[,] privileges, or immunities secured by the Constitution and laws [of the United States]."  *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States"); *Chapman v. Houston*

*Welfare Rights Org.*, 441 U.S. 600, 617 (1979) ("One cannot go into court and claim a 'violation of § 1983'-- for § 1983 by itself does not protect anyone against anything.").

In *Maine v. Thiboutot*, 448 U.S. 1 (1980), the Supreme Court interpreted the "and laws" language in the statute and held that § 1983 may be used to enforce violations of certain rights created by federal statutes as well as rights created by the Constitution.[1] The *Maine* Court ignored the scanty legislative history associated with the addition of the "and laws" language, recognizing that § 1983 could be used to enforce federal rights created in favor of individual persons by statute.  However, the Supreme Court has emphasized that "in order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *see also Gonzaga*, 536 U.S. at 283 (quoting *Blessing*).[2] Federal statutes, however, will not give rise to federal rights enforceable by an individual under § 1983 if (1) "the statue [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983," or (2) "Congress has foreclosed such

---

[1] Initially, § 1983 came onto the books as part of the Ku Klux Klan Act of April 20, 1871, often called the Civil Rights Act of 1871.  Act of Apr. 20, 1871, ch. 22, 17 Stat. 13. It is commonly accepted that Congress enacted this legislation to alleviate state-sanctioned discrimination following the adoption of the Civil War amendments.  *See Monroe v. Pape*, 365 U.S. 167, 171 (1961).  As originally passed the Civil Rights Act of 1871 only provided a cause of action for deprivation of constitutional rights.  The phrase "and laws" was added in 1874.  *See* Rev. Stat. 1979 (1874); *Maine*, 448 U.S. at 15-16 (Powell, J., dissenting) (discussing the legislative history).

[2] Despite conflicting opinions from sister circuits, the Sixth Circuit has also permitted federal regulations to create rights enforceable under § 1983 by their own force.  *See Levin v. Childers*, 101 F.3d 44, 47 (6th Cir. 1996); *Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir. 1994); *see also Johnson v. City of Detroit*, 319 F. Supp. 2d 756, 770 (E.D. Mich. 2004) (suggesting that the Sixth Circuit's rule should be reexamined in light of recent Supreme Court precedent and reasoning from sister circuits).

enforcement . . . in the enactment itself." *Wright v. Roanoke Redevelopment and Hous. Auth.*, 479 U.S. 418, 423 (1987).

In *Blessing v. Freestone*, the Supreme Court identified three "factors" to guide a court's inquiry into whether or not a statute confers an individual federal right: (1) "Congress must have intended that the provision in question benefit the plaintiff;" (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial resources;" and (3) "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Blessing,* 520 U.S. at 340-41; *Banks v. Dallas Hous. Auth.*, 271 F.3d 605, 609 (5th Cir. 2001).  Although courts in the Sixth Circuit have historically applied the three factors identified in *Blessing* as a "three-part test,"[3] the Supreme Court recently resolved the confusion that such a "test" has caused in determining whether Congress unambiguously conferred rights on individuals to support a cause of action under § 1983.  *Gonzaga*, 536 U.S. at 283.

In *Gonzaga*, the Court considered whether the Family Educational Rights and Privacy Act ("FERPA") creates a federal right enforceable by individuals under 42

---

[3] Compare *Westside Mothers,* 289 F.3d at 852 (applying the *Blessing* factors as a three-part "test"); *Wood v. Tompkins*, 33 F.3d 600, 607 (6th Cir. 1994) (applying "the Three Part 'Enforceable Rights' Test"), *with Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (referring to *Blessing* "factors"); *Hughlett v. Romer-Sensky*, No. 02-3886, 2004 WL 435890, *3 & n.3 (6th Cir. Mar. 4, 2004) (applying the "factors" in *Blessing* and noting that the Supreme Court has clarified the application of the first "benefit" factor and made clear that the court's focus should be on "whether the statutory provision contained . . . 'rights creating' language critical to showing the requisite congressional intent to create new rights.")  In *Gonzaga*, the Supreme Court did not expressly reject the three factors from *Blessing*, but did "reject the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action under § 1983."  *Gonzaga*, 536 U.S. at 283.

U.S.C. § 1983.  In examining the text and structure of the statutory language relied on by the plaintiff, the court held that FERPA's nondisclosure provisions did not create federal rights actionable under § 1983.  *Id.* at 290.  In finding that Congress did not create federal rights, the Court determined that FERPA's nondisclosure provisions "contain no rights-creating language," "have an aggregate, not individual focus," and "serve primarily to direct the Secretary of Education's distribution of public funds."  *Id.*

The *Gonzaga* Court tightened and clarified the requirements that must be met before a court may declare that Congress created a federal right enforceable under § 1983 in two fundamental aspects.  First, the Supreme Court clarified the conflict between the Court's implied right of action cases and its cases focusing on enforceable federal rights under § 1983.  The Court rejected "the notion that our implied right of action cases are separate and distinct from our § 1983 cases."  "To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983."  *Id.* at 283.  The court further explained,

> We have recognized that whether a statutory violation may be enforced through § 1983 "is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute." *Wilder, supra,* at 508, n.9, 110 S.Ct. 2510.  But the inquiries overlap in one meaningful respect--in either case we must first determine whether Congress *intended to create a federal right.*  Thus we have held that "[t]he question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative" where a "statute by its terms grants no private rights to any identifiable class." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).  For a statute to create such private rights, its text must be "phrased in terms of the persons benefitted." *Cannon v. University of Chicago,* 441 U.S. 677, 692, n.13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).  We have recognized, for example, that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes are phrased "with an *unmistakable focus* on the benefitted class." *Id.,* at 691, 99 S.Ct. 1946 (emphasis added).  But even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an

11

> implied right of action still must show that the statute manifests an intent
> "to create not just a private *right* but also a private *remedy*." *Alexander v.*
> *Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

*Id.* at 283-84 (emphases added).  The Court has made it clear that "[a] court's role in

discerning whether personal rights exist in the § 1983 context should . . . not differ from

its role in discerning whether personal rights exist in the implied right of action context."

*Id.* at 285.

Second, the Court clarified the judicial role and the proper inquiry for courts in

determining whether statutes create enforceable rights under § 1983.   The Court

reviewed its prior cases involving federal spending clause legislation and determined

that a court's fundamental role is to determine whether Congress has created new

federal rights unambiguously based on the text and structure of a statute.  *Id.* at 283-91.

The first step the court must take is determining "whether Congress *intended to*

*create a federal right*."  *Id.* at 283; *see also Sabree v. Richman*, 367 F.3d 180, 189-192

(3d Cir. 2004) (*Gonzaga* analysis starts with examining statutory text and structure);

*Long Term Care Pharmacy Alliance,* 362 F.3d at 57-58; *Schmitt v. City of Detroit*, 267 F.

Supp. 2d 718, 721 (E.D. Mich. 2003).  Such an intent will be clear from statutory text

"phrased in terms of the persons benefitted," which employs "explicit rights-creating

language."  *Gonzaga*, 536 U.S. at 284.

The *Gonzaga* Court concluded "where the text and structure of a statute provide

no indication that Congress intends to create new individual rights, there is no basis for

a private suit, whether under § 1983 or under an implied right of action."  *Id.* at 284;

*Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) ("statutes that focus on the person

regulated rather than the individuals protected create 'no implication of an intention to confer rights on a particular class of persons.'").

Furthermore, the Court rejected the argument that federal rights were created by federal statutes so long as Congress "intended that the statute 'benefit' putative plaintiffs." *Id.* at 282. "The question is not simply who would benefit from the [statute], but whether Congress intended to confer *rights* upon those beneficiaries." *California v. Sierra Club*, 451 U.S. 287, 294 (1981). As the *Gonzaga* Court stated, "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983]." *Gonzaga*, 536 U.S. at 283; *see also Hughlett*, 2004 WL 435890 at n.3 (rights-creating language is critical to Congressional intent to create new federal rights).

## B. *Gonzaga*, Unambiguously Conferred Rights, and Rights-Creating Language

Following the lead of a recent detailed opinion by the Third Circuit in *Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004), the court finds it important to examine *Gonzaga* and the Court's cases harmonized therein to determine what type of statutory language and structure unambiguously confer rights and what type of language constitutes "rights-creating language." *See Sabree*, 367 F.3d at 183-93 (examining the essential characteristics of an "unambiguously conferred right" under *Gonzaga*).

"In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981). Notwithstanding this general principle made clear in *Pennhurst*, the Supreme Court has ruled that "in some instances Congress has unambiguously conferred rights that may be

13

vindicated by individuals suits brought under § 1983." *Sabree*, 367 F.3d at 183 (citing *Gonzaga*).

Only twice since *Pennhurst*, however, has the Supreme Court found congressional intent in spending legislation to confer enforceable rights under § 1983, first in *Wright v. Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418 (1987) and then in *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990). *Gonzaga*, 536 U.S. at 280.

In *Wright*, the Court allowed a § 1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act. The Court's decision rested on the ground that the statutory provision at issue "unambiguously conferred 'a mandatory [benefit] focusing on the individual family and its income.'" *Id.* (quoting *Wright*, 479 U.S. at 430.)[4] The Court found that "Congress spoke in terms that 'could not be clearer' *ibid.*,

---

[4] The rent-ceiling provision examined in *Wright* provided, in part:

Dwelling units assisted under this chapter shall be rented only to families who are lower income families at the time of their initial occupancy of such units. Reviews of family income shall be made at least annually. *A family shall pay* as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f(*o*) of this title) the highest of the following amounts, rounded to the nearest dollar:

(1) 30 per centum of the family's monthly adjusted income;

(2) 10 per centum of the family's monthly income; or

(3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

42 U.S.C. § 1437a (1982 ed. & Supp. III).

14

and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*.'" *Id.* Also significant was the lack of a procedure by which tenants could complain. *Id.*

Second, in *Wilder v. Virginia Hospital Ass'n*, the Supreme Court permitted a § 1983 suit brought by health care providers to enforce a reimbursement provision found in the Medicaid Act, Title XIX of the Social Security Act, the Title at issue in this case. The Court allowed the individual providers to employ § 1983 to enforce rights because "much like the rent-ceiling provision in *Wright*, [the reimbursement provision of the Medicaid Act 42 U.S.C. § 1396a(1)(13) (1982 ed., Supp. V.)] explicitly conferred specific monetary entitlements upon the plaintiffs." *Id.* The text of the reimbursement provision provided, in relevant part:

> A State plan for medical assistance must ... provide ... for payment ... of hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State funds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V).

"Congress left no doubt of its intent for private enforcement, we said . . . because the provision required States to pay an 'objective' monetary entitlement to individual health care providers, with no sufficient administrative means of enforcing the requirement against States that failed to comply." *Gonzaga*, 536 U.S. at 280-81.

15

The *Gonzaga* court also examined "more recent decisions [that] have rejected attempts to infer enforceable rights from Spending Clause statutes." *Id.* at 281. In *Suter v. Artist M.*, 503 U.S. 347 (1992), the Court foreclosed an action under § 1983 filed on behalf of a class of parents and children who sought to enforce provisions of the Adoption Assistance and Child Welfare Act. That Act required states to have a "plan" to "make reasonable efforts to keep children out of foster homes." *Id.;* 42 U.S.C. § 671(a)(3), (15) (1988 ed. & Supp. I). The *Suter* Court explained:

> Careful examination of the language . . . does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner [of reducing or eliminating payments].

*Suter,* 503 U.S. 363 (quoted approvingly by *Gonzaga Univ.,* 536 U.S. at 281).

In *Blessing v. Freestone*, the Supreme Court also rejected a § 1983 claim brought by five mothers whose children were eligible to receive child support services from the State of Arizona under Title IV-D of the Social Security Act. Title IV-D required States receiving federal child-welfare funds to "substantially comply" with requirements designed to ensure timely payment of child support. *Gonzaga*, 536 U.S. at 281; 42 U.S.C. §§ 651-69 (1996). Plaintiffs asserted that "they had an enforceable individual right to have the State's program achieve 'substantial compliance' with the requirements of Title IV-D," as required in Title IV-A. *Blessing*, 520 U.S. at 333. The *Blessing* Court held that 42 U.S.C. § 609(a)(8), a provision within Title IV-D authorizing the Secretary of Health and Human Services to reduce payments to a state that does not "substantially comply" with Title IV-D, did not give rise to individual rights actionable under 42 U.S.C. § 1983. *Blessing*, 520 U.S. at 344. The Court explained,

16

>As best we can tell, the Court of Appeals seemed to think that respondents had a right to require the Director of Arizona's child support agency to bring the State's program into substantial compliance with Title IV-D.  But the requirement that a State operate its child support program in "substantial compliance" with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right.  Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV-D program.  Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied.

>. . .

>The Court of Appeals erred not only in finding that individuals have an enforceable right to substantial compliance, but also in taking a blanket approach to determining whether Title IV-D creates rights.  It is readily apparent that many other provisions of that multifaceted statutory scheme do not fit our traditional three criteria for identifying statutory rights.  To begin with, many provisions, like the "substantial compliance" standard, are designed only to guide the State in structuring its systemwide efforts at enforcing support obligations.  These provisions may ultimately benefit individuals who are eligible for Title IV-D services, but only indirectly.

*Id.* at 344-45.

The *Gonzaga* Court explained the *Blessing* holding as follows:

"Because the provision focused on 'the aggregate services provided by the State,' rather than 'the needs of any particular person,' it conferred no individual rights and thus could not be enforced by § 1983.  We emphasized: 'To seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.'*" *Gonzaga Univ.,* 536 U.S. at 281, 122 S.Ct. 2268 (quoting *Blessing,* 520 U.S. at 340 (emphasis in original)).

The *Blessing* Court did not foreclose the possibility that specific provisions in Title IV-D of the Act might create enforceable rights in individuals.  *Blessing*, 520 U.S. at 345 ("We do not foreclose the possibility that some provisions of Title IV-D give rise  to

individual rights.  The lower court did not separate out the particular rights it believed

arise from the statutory scheme, and we think the complaint is less than clear in this

regard.")  "Rather[,] the Court concluded that plaintiffs had failed to assert any specific

rights, instead relying on the general requirement that Arizona 'substantially comply'

with its Child Welfare Plan."  *Sabree*, 367 F.3d at 187 (citations omitted).  The *Blessing*

court ultimately remanded the case for the district court to examine the specific claims

and provisions of the statute to determine whether there exist specific enforceable

rights.

> In any event, it is not at all apparent that respondents sought any relief
> more specific than a declaration that their "rights" were being violated and
> an injunction forcing Arizona's child support agency to "substantially
> comply" with all of the provisions of Title IV-D.  We think that this defect is
> best addressed by sending the case back for the District Court to construe
> the complaint in the first instance, in order to determine exactly what
> rights, considered in their most concrete, specific form, respondents are
> asserting.  Only by manageably breaking down the complaint into specific
> allegations can the District Court proceed to determine whether any
> specific claim asserts an individual federal right.

*Blessing*, 520 U.S. at 346.

To confer enforceable rights, Congress must employ "rights-creating language."

*Gonzaga*, 536 U.S. at 287; *see also Sandusky County Democratic Party v. Blackwell*,

387 F.3d 565, 572 (6th Cir. 2004) (finding unambiguous rights-creating language in §

302(a)(2) of the Help America Vote Act, Pub.L. 107- 252. Title III, § 302, 116 Stat. 1706

(codified at 42 U.S.C. § 15301 *et seq.*)); *Sabree*, 367 F.3d at 187 (discussing "rights-

creating language"); *S.D. ex rel Dixon v. Hood*, 391 F.3d 581, 602-03 (5th Cir. 2004)

("[c]ritical to this inquiry is whether the pertinent statute contains 'rights-creating'

language").

18

Rights-creating language "must clearly impart 'an individual entitlement,' and have an 'unmistakable focus on the benefitted class'" as gleaned from the text and structure of the statutory provision enacted. *Sabree*, 367 F.3d at 187 (quoting *Gonzaga*, 536 U.S. at 287); *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 57 (1st Cir. 2004) ("rights creating language" and identification of a discrete class of beneficiaries are "two touchstones" in the *Gonzaga* analysis). "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)); *see also Johnson v. City of Detroit*, 319 F. Supp. 2d 756, 764 (E.D. Mich. 2004) (examining rights-creating language).

As this court has explained before, *Gonzaga* also identified Title VI of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972 as statutes providing examples of rights-creating language.

> *Gonzaga* highlighted the type of rights-creating language that confers a federal right on individuals by citing to the statutory language contained in Title VI of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972. *Gonzaga,* 536 U.S. at 283-84, 122 S.Ct. 2268. Title VI confers individual federal rights. It provides, in relevant part: "No *person* in the United States *shall ... be subjected to* discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphases added). Likewise, Title IX's language created individual rights. It provides: "*No person* in the United States *shall,* on the basis of sex ... *be subjected to* discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphases added).

*Johnson*, 319 F. Supp. 2d at 764-65; *see also Sabree*, 367 F.3d at 187 (the Supreme Court has recognized "that Title VI of the Civil Rights Act of 1964 and Title IX of the

19

Education Amendments of 1973 create individual rights because those statutes are phrased 'with an *unmistakable focus* on the benefitted class'").

It is with this guidance that the court must proceed to determine whether the specific provisions of the Medicaid Act that Plaintiffs have identified in their first amended complaint reflect an unambiguous congressional intent to confer individual federal rights enforceable under the "and laws" language of § 1983.

### C.  The Law of the Case Doctrine

Before reaching the specific provisions of the Medicaid statute in this case, however, the court must first address Plaintiffs' argument that re-examination of whether Plaintiffs have enforceable rights under § 1983 is barred by the law of the case doctrine. (Pls.' Resp. at 7-8.)  "The law-of-the-case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *Scott v. Churchill*, 377 F.3d 565, 569-70 (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  This doctrine, however, merely directs a court's discretion; it does not limit the tribunal's power.  *Id.*

The so-called "mandate rule" is a specific application of the law of the case doctrine.  *Id.*; *see also United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) ("In essence, the mandate rule is a specific application of the law-of-the-case doctrine."); *Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir. 1992).  Under the mandate rule, "lower courts must adhere to the command of a superior court."  *Brunet v. City of Columbus*, 58 F.3d 251, 254 (6th Cir. 1995).  As the *Brunet* court noted,

> [U]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal.  The trial court

20

> must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.

*Id.* (quotations omitted); *see also Allard Enters., Inc. v. Advanced Programming Res., Inc.,* 249 F.3d 564, 569-70 (6th Cir. 2001).  "As with all applications of the law of the case doctrine, the trial court may consider those issues not decided expressly or impliedly by the appellate court or a previous trail court."  *Jones*, 957 F.2d at 262 (citing *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979)).

At first glance, the law of the case doctrine appears to preclude this court from considering on remand whether the Medicaid statutory provisions cited in Plaintiffs' First Amended Complaint create enforceable rights under § 1983.  The Sixth Circuit considered "[w]hether there is a private right of action under § 1983" for Plaintiffs' claims."  *Westside Mothers*, 289 F.3d at 862-63.  The Sixth Circuit held that the district court "erred when it did not apply [the three-part *Blessing* test] to evaluate plaintiffs' claims."  *Id.* at 863.  The appellate court went on to state:

> We now apply [the *Blessing*] test.  First, the provisions were clearly intended to benefit the putative plaintiffs, children who are eligible for the screening and treatment services.  *See* 42 U.S.C. § 1396a(a)(10)(A).  "[I]t is well-settled that Medicaid-eligible children under the age of twenty-one . . . are the intended beneficiaries of the [screening and treatment] provisions."  *Dajour B. v. City of New York,* 2001 WL 830674, at *8 (S.D.N.Y. July 23, 2001); *accord Miller v. Whitburn*, 10 F.3d 1315, 1319 (7th Cir. 1993).  We have found no federal appellate cases to the contrary.  Second, the provisions set a binding obligation on Michigan.  They are couched in mandatory rather than precatory language, stating that Medicaid services "*shall* be furnished" to eligible children, 42 U.S.C. § 1396a(a)(8) (emphasis added), and that the screening and treatment provisions "*must* be provided," *id.* § 1396a(a)(10)(A), *see also* 42 C.F.R. § 441.56 (mandatory language).  Third, the provisions are not so vague and amorphous as to defeat judicial enforcement, as the statute and regulations carefully detail the specific services to be provided. *See* 42 U.S.C. § 1396d(r).  Finally, Congress did not explicitly foreclose recourse to § 1983 in this instance, nor has it established any remedial scheme

21

> sufficiently comprehensive to supplant § 1983.  *See Blessing,* 520 U.S. at 346-47, 117 S.Ct. 1353.
>
> Plaintiffs have a cause of action under § 1983 for alleged noncompliance with the screening and treatment provisions of the Medicaid Act.

*Id.*[5]

Although earlier in its opinion the Circuit Court made reference to all of the statutory provisions of the Medicaid statute relied on by Plaintiffs in their original complaint, *Westside Mothers*, 289 F.3d at 856, the panel's analysis and summary application of the *"Blessing* test" does not identify and discuss each specific statutory provision cited by Plaintiffs.  *Id.* at 862-63; *see also Blessing,* 520 U.S. at 344 (court of appeals "erred not only in finding that individuals have an enforceable right to substantial compliance, but also in taking a blanket approach to determining whether Title IV-D [of the Social Security Act] creates rights" and remanding for lower court "to determine exactly what rights, considered in their most concrete, specific form, respondents are asserting").  In fact, the court's recorded analysis reflects only two of the specific Medicaid provisions cited by Plaintiffs as creating enforceable individual federal rights under § 1983, 42 U.S.C. § 1396a(a)(10)(A) and § 1396a(a)(8).

More importantly, the court's decision on this issue was rendered prior to the Supreme Court's ruling in *Gonzaga University v. Doe* which has significantly altered the

---

[5] Absent is a discussion of the scope of the exact, concrete individual rights created under the statutory provisions at issue in this case.  For instance, there is no discussion of whether §§ 1396a(a)(8) and (a)(10) create rights to actual medical services or merely rights to have these services paid for in part or in whole by the Michigan medical assistance plan.  *See* 42 U.S.C. § 1396d(a) ("The term 'medical assistance' [as used in §§ 1396a(a)(8) & (a)(10)] means payment of part or all of the cost of the following care and services . . . to individuals . . ."); *Blessing*, 520 U.S. at 346.

necessary analysis under *Blessing* and its progeny.  This court is not persuaded by Plaintiffs' argument that the higher court's application of the *Blessing* test demonstrates its "anticipation" of the Supreme Court's clarifications and commands in *Gonzaga*.  The analysis concludes that "the provisions were clearly intended to benefit the putative plaintiffs, children who are eligible for the screening and treatment services," but does not contain an examination of the specific statutory language that creates an unmistakable focus on individuals.  *See Westside Mothers*, 289 F.3d at 863.  Nor is there identification of the "rights creating" language in the specific provisions at issue. *See id.*

To hold steadfast, under the law of the case doctrine, and to simply apply the Sixth Circuit's conclusion that "Plaintiffs have a cause of action under § 1983 for alleged noncompliance with the screening and treatment provisions of the Medicaid Act" would require this court to ignore intervening and controlling United States Supreme Court authority which has altered the analysis, at least in applying the first *Blessing* factor, for all federal courts.  *See Frazer v. Long Term Care Pharmacy Alliance*, 362 F.3d 50, 57 (1st Cir. 2004) ( finding that *Gonzaga* "charted a firm course among prior Supreme Court precedents in some tension" compelling reexamination of a prior panel decision and noting that "[a]n intervening Supreme Court decision trumps the usual rule that a panel decision is to be followed by a successor panel.").  The Sixth Circuit itself has recognized and applied the additional analysis required in the wake of *Gonzaga*.  *See Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (finding that "the rights-creating language of HAVA [the Help America Vote Act] § 302(a)(2) is unambiguous").

23

The law of the case doctrine is not so rigid that it forecloses the court from considering each statutory provision in light of *Gonzaga*'s command requiring "rights creating language." *See Leggett v. Badger*, 798 F.2d 1387, 1390 (11th Cir. 1986) (district court acted properly in refusing to enforce a mandate that was inconsistent with an intervening change in the law announced by Supreme Court); *Morrow v. Dillard*, 580 F.2d 1284, 1297 (5th Cir. 1978) (proper for the district court to conclude that an intervening Supreme Court decision had superseded the basis for the decision of the court of appeals); *see also United States v. Bell*, 988 F.2d 247, 251 & n. 2 (1st Cir. 1993).  In *Bell*, the court noted:

> Even where, as here, an appellate court's mandate does not contemplate resurrecting an issue on remand, the trial court may still possess some limited discretion to reopen the issue in very special situations.  *See id.* at 150-52; *Cochran v. M & M Transp. Co.,* 110 F.2d 519, 521 (1st Cir. 1940). After all, the so-called "mandate rule," generally requiring conformity with the commands of a superior court on remand, is simply a specific application of the law of the case doctrine and, as such, is a discretion-guiding rule subject to an occasional exception in the interests of justice. *See, e.g., Johnson v. Uncle Ben's, Inc.,* 965 F.2d 1363, 1370 (5th Cir. 1992), *petition for cert. filed,* 61 U.S.L.W. 3356 (U.S. Sept. 29, 1992) [No. 92-737]; *Jones v. Lewis,* 957 F.2d 260, 262 (6th Cir.), *cert. denied,* 506 U.S. 841, 113 S.Ct. 125, 121 L.Ed.2d 80 (1992); *United States v. Miller,* 822 F.2d 828, 832-33 (9th Cir. 1987); *Piambino v. Bailey,* 757 F.2d 1112, 1119-20 (11th Cir. 1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Continental Bank & Trust Co. v. American Bonding Co.,* 630 F.2d 606, 608 (8th Cir. 1980); *Cleveland v. FPC,* 561 F.2d 344, 348 (D.C. Cir. 1977); *Banco National de Cuba v. Farr,* 383 F.2d 166, 178 (2d Cir. 1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968); *see also Kotler,* 981 F.2d at 13 (on remand, lower court ordinarily retains the "naked power to reexamine" a closed issue, but should exercise such power "sparingly and only when ... necessary to avoid extreme injustice").  In other words, because the law of the case doctrine is a rule of policy and practice, rather than a jurisdictional limitation, it may tolerate a "modicum of residual flexibility" in exceptional circumstances. *Rivera-Martinez,* 931 F.2d at 151; *see also Cochran,* 110 F.2d at 521 (warning against allowing the law of the case doctrine to become an instrument of injustice).

*Id.*

24

Simply put, *Gonzaga* adds another required layer to the analysis which was neither addressed nor decided in the Circuit's written opinion.  *See Sabree v. Richman*, 367 F.3d 180, 189 (3d Cir. 2004) ("[O]ur inquiry does not end [after applying the *Blessing* test] because, as explained in *Gonzaga University*, the *Blessing* Test may only indicate that Plaintiffs 'fall[ ] within the general zone of interest that the statute is intended to protect; something less than what is required for a statue to create rights enforceable directly from the statute itself . . .'") (citation omitted).  The court concludes that examining each specific statutory provision at issue as directed by the Supreme Court in light of *Gonzaga* is justified under the current circumstances reflecting a significant change in controlling Supreme Court precedent.  This conclusion is warranted, notwithstanding the court's ordinary duty to follow rigidly the appellate court's mandate.

Plaintiffs' argument to the contrary is not persuasive.  Plaintiffs argue that the Sixth Circuit's finding that the statutes were "clearly intended to benefit the putative plaintiffs" ends the inquiry.  This argument, however, ignores the Supreme Court's command in *Gonzaga*.  In addition, Plaintiffs cite two cases supporting their argument, *Johnson v. City of Detroit*, 319 F. Supp. 2d 756, 771 n.8 (E.D. Mich. 2004) and *Franklin v. Francis*, 36 F. Supp.2d 1008, 1011 (S.D. Ohio 1999).

Plaintiffs claim that "regardless of any new arguments defendants may make and any 'questions whether the Sixth Circuit's decisions on this issue remain viable in light of recent Supreme Court precedent,' as in *Johnson,* this Court should 'continue to apply the Sixth's Circuit's approach until it is overruled.'"  (Pls.' Resp. at 7-8 (citing *Johnson*,

25

319 F. Supp. 2d at 771).)  This argument reflects either a misunderstanding or mischaracterization of the circumstances confronting the court in *Johnson*.

In the portion of *Johnson v. City of Detroit* cited by Plaintiffs, this court detailed the circuit split on the issue of whether federal regulations alone (as opposed to regulations that are consistent with statutory rights) may create enforceable rights under § 1983.  *Johnson*, 319 F. Supp. 2d. at 770-71.  After noting that the Supreme Court *had not* directly resolved this issue, the court detailed the position taken by a majority of the Circuit Courts of Appeal, but not adopted by the Sixth Circuit.  *Id.*  After noting more persuasive cases from sister circuits rejecting the Sixth Circuit's rule, the court applied the prevailing rule in this circuit, permitting regulations to create enforceable rights by their own accord.  *Id.; see Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir. 1994); *Levin v. Childers*, 101 F.3d 44, 47 (6th Cir. 1996).  The court followed mandatory circuit court precedent *precisely because the Supreme Court had not addressed the issue* and prior circuit precedent was binding.  Here, the Supreme Court, in *Gonzaga*, *has* held that there is at least more analysis required in applying the first *Blessing* factor.  There is no question that only "unambiguously conferred" rights will support a § 1983 action.  *Gonzaga*, 536 U.S. at 283; *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004).

*Franklin* merely notes the unremarkable proposition that the district court is generally bound by the terms of an appellate ruling.  It says nothing of intervening changes in the law announced by the U.S. Supreme Court.  Accordingly, the court turns to Defendants' *Gonzaga* arguments.

26

### C.  Plaintiffs' Count I "Failure to Provide Healthcare to all Eligible Children"

"The Medicaid Act is . . . a large and complex statute, and whether plaintiffs seeking to enforce a federal right under the Medicaid Act can meet this requirement depends on which statutory provisions they rely." *Frazar v. Gilbert*, 300 F.3d 530, 539 (5th Cir. 2002), *rev'd on other grounds*, 540 U.S. 431 (2004).[6]  "Only by manageably breaking down the complaint into specific allegations can the District Court proceed to determine whether any specific claim asserts an individual federal right" enforceable under § 1983.  *Blessing*, 530 U.S. at 330-31.

In Count I, Plaintiffs claim that Defendants have refused or failed to provide "medical assistance" with "reasonable promptness" to "all eligible individuals" in violation of 42 U.S.C. §§ 1396a(a)(8) and (a)(10), as defined by 42 U.S.C. § 1396d(a) and (r). (Pls.' First Amend. Compl. at ¶¶ 47-48.)  The court will examine Plaintiffs' claim in Count I in two stages.  First, it will examine whether these specific provisions of the Medicaid Act create enforceable rights under § 1983.  Second, if so, the court will examine the scope of such rights and to what extent Plaintiffs have stated a claim upon which relief may be granted on those rights.

### 1.  Whether §§ 1396a(a)(8) and (a)(10) Create Enforceable Rights in Plaintiffs

Statutory interpretation always begins with the text.  *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004) (quoting *Good Samaritan Hosp. v. Shalala,*

---

[6] This legislation has given courts occasion to lament.  "The complexity of the Social Security Act is the stuff of legend.  The Supreme Court has offered the following lamentation on the subject.  'The Social Security Act is among the most intricate ever drafted by Congress.  Its Byzantine construction ... makes the Act almost unintelligible to the uninitiated.'"  *Hillburn v. Commissioner,* No. H-82-200, 1985 WL 2364 at * 1-*2 (D.Conn. July 17, 1985) (quoting *Schweiker v. Gray Panthers,* 453 U.S. 34, 43 (1981)).

508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.'")).

Section 1396a(a) describes the contents of "a State plan for medical assistance" under Title XIX.  Specifically, § 1396a(a)(8), the "reasonable promptness" provision and § 1396a(a)(10)(A) provide:

(a) Contents

A State plan for medical assistance must–

. . .

(8) provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals;

. . .

(10) provide–
(A) for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a) of this title to
(i) all individuals [who meet certain requirements]

42 U.S.C. § 1396a(a).

The term "medical assistance" as used in §§ 1396a(a)(8) and (a)(10) is defined at 42 U.S.C. § 1396d(a).  That Section provides, in relevant part:

(a) Medical Assistance

The term "medical assistance" means payment of part or all of the cost of the following care and services . . . to individuals . . . who are

(i) under the age of 21, or at the option of the State, under the age of 20, 19, or 18 as the State may choose

. . . [omitted here is a list of remaining eligible individuals]

but whose income and resources are insufficient to meet all of such cost–

28

    (1) inpatient hospital services (other than services in an institution for mental diseases);

    (2) (A) outpatient hospital services, (B) consistent with State law permitting such services, rural health clinic services (as defined in subsection (l)(1) of this section) and any other ambulatory services which are offered by a rural health clinic (as defined in subsection (l)(1) of this section) and which are otherwise included in the plan, and (C) Federally-qualified health center services (as defined in subsection (l)(2) of this section) and any other ambulatory services offered by a Federally-qualified health center and which are otherwise included in the plan;

    (3) other laboratory and X-ray services;

    (4) (A) nursing facility services (other than services in an institution for mental diseases) for individuals 21 years of age or older; **(B) early and periodic screening, diagnostic, and treatment services (as defined in subsection (r) of this section) for individuals who are eligible under the plan and are under the age of 21**; and (C) family planning services and supplies furnished (directly or under arrangements with others) to individuals of child-bearing age (including minors who can be considered to be sexually active) who are eligible under the State plan and who desire such services and supplies . . . .

42 U.S.C. § 1396d(a) (emphasis added).

    Subsection (r) defines "early and periodic screening, diagnostic and treatment"

(EPSDT) services as follows:

The term "early and periodic screening, diagnostic, and treatment services" means the following items and services:
(1) Screening services--

    (A) which are provided--

        (i) at intervals which meet reasonable standards of medical and dental practice, as determined by the State after consultation with recognized medical and dental organizations involved in child health care and, with respect to immunizations under subparagraph (B)(iii), in accordance with the schedule referred to in section 1396s(c)(2)(B)(i) of this title for pediatric vaccines, and

(ii) at such other intervals, indicated as medically necessary, to determine the existence of certain physical or mental illnesses or conditions; and

(B) which shall at a minimum include--

(i) a comprehensive health and developmental history (including assessment of both physical and mental health development),

(ii) a comprehensive unclothed physical exam,

(iii) appropriate immunizations (according to the schedule referred to in section 1396s(c)(2)(B)(i) of this title for pediatric vaccines) according to age and health history,

(iv) laboratory tests (including lead blood level assessment appropriate for age and risk factors), and

(v) health education (including anticipatory guidance).

(2) Vision services--

(A) which are provided--

(i) at intervals which meet reasonable standards of medical practice, as determined by the State after consultation with recognized medical organizations involved in child health care, and

(ii) at such other intervals, indicated as medically necessary, to determine the existence of a suspected illness or condition; and

(B) which shall at a minimum include diagnosis and treatment for defects in vision, including eyeglasses.

(3) Dental services--

(A) which are provided--

(i) at intervals which meet reasonable standards of dental practice, as determined by the State after consultation with recognized dental organizations involved in child health care, and

(ii) at such other intervals, indicated as medically necessary, to determine the existence of a suspected illness or condition; and

(B) which shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health.

(4) Hearing services--

(A) which are provided--

    (i) at intervals which meet reasonable standards of medical practice, as determined by the State after consultation with recognized medical organizations involved in child health care, and

    (ii) at such other intervals, indicated as medically necessary, to determine the existence of a suspected illness or condition; and

(B) which shall at a minimum include diagnosis and treatment for defects in hearing, including hearing aids.

(5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

Nothing in this subchapter shall be construed as limiting providers of early and periodic screening, diagnostic, and treatment services to providers who are qualified to provide all of the items and services described in the previous sentence or as preventing a provider that is qualified under the plan to furnish one or more (but not all) of such items or services from being qualified to provide such items and services as part of early and periodic screening, diagnostic, and treatment services. *The Secretary shall, not later than July 1, 1990, and every 12 months thereafter, develop and set annual participation goals for each State for participation of individuals who are covered under the State plan under this subchapter in early and periodic screening, diagnostic, and treatment services.*

42 U.S.C. § 1396d(r) (emphasis added).

Other courts that have considered whether §§ 1396a(a)(8) and (a)(10) create individual federal rights in Medicaid recipients enforceable via § 1983 since the Court decided *Gonzaga* have come to contrary conclusions. *Compare Sabree*, 367 F.3d at 190 (finding unmistakable individual focus in §§ 1396a(a)(8), (a)(10), and (a)(15) and concluding that, although the more general Medicaid Act provisions at § 1396 and § 1396c do not contain rights-creating language, they do not foreclose a finding of such enforceable rights in the more specific provisions of §§ 1396a(a)(8) & (a)(10)); *S.D. ex rel Dixon*, 391 F.3d at 603 ("EPSDT care and services are listed in paragraph 4 of §

31

1396d(a) and, by reference to § 1396d(r), include all the health care, treatment, services, and other measures described in § 1396d(a) when necessary for corrective or ameliorative purposes. [The language of §§ 1396a(a)(10)(A)(i),  1396d(a), and 1396d(r)] is precisely the sort of 'rights-creating' language identified in *Gonzaga* as critical to demonstrating a congressional intent to establish a new right."); *Mendez v. Brown*, 311 F. Supp. 2d 134, 140 (D. Mass. 2004) ("sections 1396a(8), (10) and (17) all contain 'rights creating' language"); *Clark v. Richman*, 339 F. Supp. 2d 631 (M.D. Pa. 2004) (following *Sabree* and holding that these sections create enforceable rights to "medical assistance"); *Bryson v. Shumway*, 308 F.3d 79, 88 (1st Cir. 2002) (concluding,  without significant analysis in light of *Gonzaga*, that the reasonable promptness provision § 1396a(a)(8) creates enforceable rights); *Memisovski v. Maram*, No. 92 C 1982, 2004 WL 1878332, at *9 (N.D. Ill. Aug. 23, 2004) (EPSDT provisions found in Medicaid Act create enforceable rights to services); *with M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (reasonable promptness requirement of § 1396a(a)(8) does not contain explicit rights-creating language and merely places certain conditions upon a state seeking Medicaid funding); *Sanders v. Kansas Dep't of Soc. and Rehabilitation Servs.*, 317 F. Supp. 2d 1233, 1250 (D. Kan. 2004) (noting that whether the language of § 1396a(a)(8) creates individual rights enforceable under § 1983  presents a close question and concluding that its language "creates a duty of the State to furnish 'medical assistance' with reasonable promptness," but does not contain the explicit rights-creating language described in *Gonzaga*).  *See also Frazar v. Gilbert*, 300 F.3d 530, 544 (5th Cir. 2002) (pre-*Gonzaga* decision finding that "[a]lthough relief under § 1983 for a violation of EPSDT provisions may be available, perfect state compliance

with these provisions is not required" and "Congress did not intend that a court can require that a state participating in the Medicaid program must always provide every EPSDT service to every eligible person at all times."); *Bruggeman v. Blagojevich*, 324 F.3d 906, 911 (7th Cir. 2003) (42 U.S.C. § 1396a(a)(19) was "insufficiently definite to be justiciable, and in addition cannot be interpreted to create a private right of action, given the Supreme Court's hostility, most recently and emphatically expressed in *Gonzaga University v. Doe*, to implying such rights in spending statutes.")

Because the Sixth Circuit has already determined that §§ 1396a(a)(8) and (a)(10) satisfied the three *Blessing* factors *unmodified* by *Gonzaga*, the court turns to the issue of whether Congress unambiguously conferred rights on the children eligible for "medical assistance" under these provisions in light of the Court's new command.

As the *Sabree* court correctly pointed out, the general language contained in 42 U.S.C. §§ 1396 and 1396c simply does not create enforceable individual rights. *Sabree*, 367 F.3d at 190, 191. The court explained,

> The opening section of Title XIX-Section 1396-is the appropriations and general introductory statement of the Medicaid Act. As that Section explains, Title XIX was enacted "[f]or the purpose of enabling each State ... to furnish ... medical assistance." 42 U.S.C. § 1396. This language says nothing of individual entitlements or rights, but reminds us that we are dealing with an agreement between Congress and a particular state, and recalls the axiom of *Pennhurst:* "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State Sch. & Hosp.,* 451 U.S. at 28, 101 S.Ct. 1531
>
> Turning next, as did the District Court, to Section 1396(c) does not help in the search for rights-creating language. *Sabree,* 245 F.Supp.2d at 660. Section 1396c empowers the Secretary of HHS to suspend payments to a state if it fails to "comply substantially" with the requirements of Title XIX. This language not only confirms that Title XIX by its terms creates a relationship between Congress and a particular state, but it recalls, as

33

well, the "comply substantially" language in *Blessing* and *Gonzaga University. Blessing,* 520 U.S. at 343, 117 S.Ct. 1353; *Gonzaga Univ.,* 536 U.S. at 289, 122 S.Ct. 2268. Of course, in *Blessing* and *Gonzaga University,* such language counseled against the recognition of an unambiguously conferred right.

*Id.* at 191-92 (footnotes omitted).

Plaintiffs, however, rely on the more specific statutory provisions in the Medicaid Act found at §§ 1396a(a)(8) and (a)(10). Although this court does not share the conclusion that it is "difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language 'A State plan must provide' from the 'No person shall' language" found in Title VI and IX of the Civil Rights Act, the court does hold that the relevant provisions focus on eligible individuals and not solely on the entity regulated.

*Gonzaga* did not overrule *Wilder,* a case where the Court found, in a provision of the Medicaid Act similar to the ones at hand, congressional intent to create individual rights enforceable under § 1983. *See Sabree,* 367 F.3d at 194 (Alito, J., concurring) ("While the analysis and decision of the District Court [finding no rights-creating language (*Sabree,* 245 F. Supp. 2d at 661)] may reflect the direction that future Supreme Court cases in this area will take, currently binding precedent supports the decision of the Court.").

As noted above, the important statutory language examined in *Wilder* provided:

A State plan for medical assistance *must ... provide ... for payment* ... of hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State funds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable

34

> State and Federal laws, regulations, and quality and safety standards and
> to assure that individuals eligible for medical assistance have reasonable
> access ... to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V).  This language was sufficient to

create enforceable rights because it required states to pay specific monetary

entitlements to Medicaid providers.  *See Gonzaga*, 536 U.S. at 280 ("Congress left no

doubt of its intent for private enforcement, we said, because the provision required

States to pay an 'objective' monetary entitlement to individual health care providers,

with no sufficient administrative means for enforcing the requirement against States that

failed to comply.")

Likewise, § 1396a(a)(8) states that Michigan's state plan "must provide that all

individuals wishing to make application for medical assistance under the plan shall have

opportunity to do so, and that such assistance shall be furnished with reasonable

promptness to all eligible individuals."  Here, the statutory provision refers to identifiable

benefits in the form of "medical assistance" and the language refers to eligible

individuals, providing that the States must provide an opportunity for "all individuals

wishing to make application for medical assistance."  The text goes on to require State

plans to furnish "medical assistance" "with reasonable promptness" to those who make

application and who are eligible.   42 U.S.C. § 1396a(a)(8).

Similarly, § 1396a(a)(10) requires that Michigan's plan "provide for making

medical assistance available, including at lest the care and services listed in paragraphs

(1) through (5), (17) and (21) of section 1396d(a) . . to all individuals [who qualify]."  42

U.S.C. § 1396a(10).  The EPSDT services are included in § 1396d(a)(4)(B) and defined

at § 1396d(r).  Although this language is not the type of rights conferring language that

would undoubtedly foreclose debate on this issue, it is sufficient in light of the Supreme

Court's continued approval of *Wilder*.  This provision of the Medicaid Act refers to an

identifiable benefit of "medical assistance" and identifies individuals who qualify as the

benefitted class.  While a different conclusion might result if this court were writing on a

clean slate, *Gonzaga*'s approval of § 1396a(a)(13) in *Wilder* results in the conclusion

that Plaintiffs may sue Defendants under 42 U.S.C. § 1983 to obtain the "medical

assistance" for which they qualify.  *See Sabree*, 367 F.3d at 192 ("Our confidence in this

conclusion [that §§ 1396a(a)(8) and (a)(10) create enforceable rights via § 1983] rests

securely on the fact that the Court has refrained from overruling *Wright* and *Wilder*.").

This conclusion then leads the court to the next disputed issue; what constitutes

"medical assistance?"  *See, e.g., id.* at 181 n. 1 (noting an apparent disagreement

among circuit courts as to whether a State must provide financial assistance or actual

medical services themselves and that "[t]he only issue before us, however, is whether

plaintiffs may sue Pennsylvania under 42 U.S.C. § 1983 to obtain the 'assistance' for

which they qualify," and leaving the district court to consider the appropriate remedy for

a violation of the provisions).

### 2.  Scope of Enforceable Rights to "Medical Assistance"

Defendants argue that Plaintiffs dispute the extent to which Medicaid recipients

are receiving actual EPSDT medical services and claim "a right to compel Defendants

to ensure 100% recipient participation in EPSDT screening" and, therefore, have no

private right of action to enforce such a claim under §§ 1396a(a)(8) and (a)(10).  During

oral argument on Defendants' motion, Plaintiffs' counsel argued that "medical

assistance" includes the provision of actual medical services and is not limited to

payment for such services.  This argument creates two issues with regard to the scope of rights enforceable under § 1983.

First, it raises the issue of whether eligible medicaid recipients are entitled to financial assistance or to have the state provide actual medical services.  This issue turns on the meaning of "medical assistance" as that term is used in § 1396a(a) and defined by Congress at § 1396d(a).

Second, Defendants' argument raises the issue of whether Plaintiffs have an enforceable right under these Medicaid provisions to compel a participating State to undertake efforts to make all "medical assistance" available to every state citizen who might be eligible or whether the enforceable rights are limited to those individuals who qualify for and have been denied "medical assistance."

Citing 42 U.S.C. § 1396d(a) & (r), Plaintiffs' first cause of action avers that "medical assistance" includes more than payment and means "regular check-ups at intervals determined by the state after consultation with medical and dental organizations," "diagnoses, then treatment and then other measures to correct or ameliorate . . . defects and physical and mental illnesses and conditions" etc.  (*See* Pls.' First Amend. Compl. at ¶¶ 45-46.)  On the other hand, Defendants argue "medical assistance" means *payment* for medical services and "at best only imposes a duty to pay for covered medical services[;] It does not impose any requirement on the state to directly provide any medical service."  (Defs.' Mot. Br. at 10-11; Defs.' Reply at 12.)

There appears to be disagreement among courts as to whether "medical assistance" includes payment for covered services or provision of those services.  Many courts have presumed that "medical assistance" includes provision of services to which

37

a state is obligated to provide under § 1396a(a).  *See, e.g.*, *S.D. ex rel Dixon*, 391 F.3d at 596 ("For all of the foregoing reasons, we conclude that LDHH violated the Medicaid Act by denying S.D. a service described in § 1396d(a) that is necessary for ameliorative purposes under the EPSDT program." (citing § 1396d(r)(5))); *Bryson v. Shumway*, 308 F.3d 79, 81 (1st Cir. 2002); *Doe v. Chiles*, 136 F.3d 709, 714 (11th Cir. 1998).

Other courts, after examining the statutory text, have concluded that "medical assistance" as defined by § 1396d(a) refers only to financial assistance associated with covered medical treatment and services.  *See, e.g.*, *Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003) ("the statutory reference to 'assistance' appears to have reference to financial assistance rather than to actual medical services"); *Clark v. Richman*, 339 F. Supp. 2d 631,  (M.D. Pa. 2004); *Sanders v. Kansas Dep't of Soc. and Rehabilitation Servs.*, 317 F. Supp. 2d 1233, 1250 (D. Kan. 2004).

To the extent that Plaintiffs' Count I alleges a failure by Defendants in their official capacity to ensure the actual provision of, or arrangement for, medical services, it fails to state a claim.  A plain reading of § 1396a(a)(10) and § 1396d(a) supports the conclusion that Michigan is not required to provide medical services directly under §§ 1396a(a)(8) or (a)(10).  "Medical assistance" means "*payment* of part or all of the cost of [listed] care and services."  42 U.S.C. § 1396d(a)(emphasis added).  *See Bruggeman*, 324 F.3d at 910; *Clark*, 339 F. Supp. 2d at 1250; *Schott v. Olszewski*, – F.3d –,Nos. 03-2490 & 03-2536, 2005 WL 588751, at *3 (6th Cir. Mar. 15, 2005) (Slip Opinion) ("The Act defines 'medical assistance' as 'payment of part or all of the cost of the [covered] care and services ... for individuals.'  § 1396d(a).").

In *Bruggeman*, the Seventh Circuit reversed a district court's holding that developmentally disabled individuals did not have standing to allege violations of certain provisions in the Medicaid Act including § 1396a(a)(8), the reasonable promptness provision. *Bruggeman*, 324 F.3d at 910. The plaintiffs included several mentally retarded adults who lived at home with their parents in the Chicago metropolitan area. The parents of these individuals would have preferred that their children live in institutions known as "Intermediate Care Facilities for the Developmentally Disabled," (ICF/DD") most of which were concentrated in the southern part of Illinois, far from Chicago. *Id.* at 908-09. Relying on 42 U.S.C. §§ 1396a(a)(1), (a)(8), (a)(10)(B)(i), (a)(19), and (a)(23), the plaintiffs wanted Illinois state officials to adopt a plan to expand the number ICF/DD in the northern part of the state. *Id.* at 909. The plaintiffs argued that the defendants preferred them living at home because it avoided additional costs for the State. They further alleged that the officials refused to write letters urging the authorization of additional ICF/DDs. *Id.*

According to the plaintiffs, this refusal to write letters prevented the authorization of additional facilities in the north and violated

> provisions of the Medicaid statute requiring that "medical assistance . . . shall be furnished with reasonable promptness to all eligible inviduals," that the state's system of medical assistance to Medicaid patients "shall be in effect in all political subdivisions of the State," that the assistance made available to any such patient "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual," that any eligible individual "may obtain such assistance from any institution ... qualified to perform the ... services required ... who undertakes to provide him such services," and that "services will be provided in a manner consistent with ... the best interests of the recipients."

*Id.* (citing 42 U.S.C. §§ 1396a(a)(1), (8), (10)(B)(i), (19), (23)).

39

After rejecting the lower court's standing analysis, the *Bruggeman* court turned to the merits of the plaintiffs' Medicaid claim, finding that the plaintiffs could not prevail on their claim under § 1396a(a)(8) for the provision of medical services.

> The statutory entitlement to reasonable promptness of medical services (42 U.S.C. § 1396a(a)(8)) is not infringed by the maldistribution (as it seems to the plaintiffs) of ICF/DDs across the state.  It is not as if the plaintiffs require relocation to such a facility on an emergency basis, in which event the remoteness of any such facility from their homes, where they are living at present, would deprive them of prompt treatment.  Even if they did require emergency treatment, their theory of violation would be a considerable stretch because the statutory reference to "assistance" appears to have reference to *financial* assistance rather than to actual medical *services,* though the distinction was missed in *Bryson v. Shumway,* 308 F.3d 79, 81, 88- 89 (1st Cir. 2002), and *Doe v. Chiles,* 136 F.3d 709, 714, 717 (11th Cir. 1998).  *Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals.*  The regulations that implement the provision indicate that what is required is a prompt determination of eligibility and prompt provision of funds to eligible individuals to enable them to obtain the covered medical services that they need, see 42 C.F.R. §§ 435.911(a), .930(a)-(b); a requirement of prompt *treatment* would amount to a direct regulation of medical services.

*Id.* (emphasis added).

In *Clark*, after finding that § 1396a(a)(10) created individual rights to "medical assistance" enforceable via § 1983, the court rejected the merits of plaintiffs' claims based on this provision.  *Clark*, 339 F. Supp. 2d at 641.  The reasoning of the *Clark* court (a case cited with approval by Plaintiffs in arguing that Congress created enforceable rights) follows:

> A plain reading of § 1396a(a)(10)(A) supports [the defendant's] interpretation [that it does not require the Commonwealth to provide services directly].  Section § 1396a(a)(10)(A) requires the Commonwealth to make "medical assistance" available to eligible individuals.  "Medical assistance" means "*payment* of part or all of the cost of [the enumerated types of] care and services." 42 U.S.C. § 1396d(a) (emphasis added).

> Section 1396a(a)(10)(A) arguably speaks of more than payment, though,

40

as it requires the Commonwealth, through its MA program, to "provide for making medical assistance available, *including at least the care and services* listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a)" available to eligible individuals. 42 U.S.C. § 1396a(a)(10)(A) (emphasis added). Obviously, the issue is whether the "including at least the care and services ...." language of § 1396a(a)(10)(A) expands the definition of "medical assistance" beyond simply payment for services to include actual provision of services.

We do not believe § 1396a(a)(10)(A) imposes an obligation on the Commonwealth to provide any services directly. The most reasonable interpretation of § 1396a(a)(10)(A) is that medical assistance, i.e., financial assistance, must be provided for *at least* the care and services listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a). To read the provision any other way would mean that the definition of medical assistance would be expanded, for purposes of § 1396a(a)(10)(A) only, beyond mere financial assistance and would oblige states to directly provide services as well, which would run contrary to the entire scheme envisioned under Title XIX.

*Id.*

This court agrees. "Medical assistance" as defined by § 1396d(a) and used in §§ 1396a(a)(8) and (a)(10) does not require the direct provision of medical services. *See also Sanders,* 317 F. Supp. 2d at 1250-51 ("[A]ssuming, *arguendo*, that the State's duty [in § 1396a(a)(8)] noted above gives rise to a correlative right of an eligible individual to receive 'medical assistance' in a reasonably prompt manner, plaintiff's argument nonetheless fails because the statutory reference to 'assistance' appears to refer to 'financial assistance' rather than to actual medical services.").

To the extent that Plaintiffs seek the provision of medical screening and other services directly from the state, they have failed to state a claim for violation of §§ 1396a(a)(8) and (a)(10) pursuant to 42 U.S.C. § 1983. The individual rights created by these provisions relate to "medical assistance" which was specifically defined by Congress to mean "payment of part or all of the cost of [specified services]." 42 U.S.C.

§ 1396d(a).  Plaintiffs invite the court to look to the general structure of the Medicaid statute, arguing that the statutory definition of "medical assistance" means more than payment.  The statute's structure is not sufficient to trump the specific definition of the term expressly supplied by Congress at § 1396d(a).

This case also presents the issue of whether Plaintiffs have an enforceable right under the Medicaid provisions cited to compel a participating State to undertake efforts to make "medical assistance," whatever its scope may be, available to every state citizen (or child in this case) who might be eligible for EPSDT services.  The court agrees with Defendants that the enforceable rights created under §§ 1396a(a)(8) and (a)(10) to EPSDT services are limited to those individuals who qualify for and have been denied "medical assistance" relating to these services.

This issue was considered in detail by the Fifth Circuit Court of Appeals in the pre-Gonzaga decision of Frazar v. Gilbert, 300 F.3d 530 (5th Cir. 2002).  Although Frazar is a case very different from this one procedurally, it presents a case with very similar factual allegations.

The plaintiffs in Frazer were mothers of children eligible for EPSDT services in Texas.  Like the instant Plaintiffs, they filed a civil action under § 1983 seeking injunctive relief against responsible state officials (in their official capacity) at the state agency charged with implementing the Texas EPSDT program.  Frazar, 300 F.3d at 533-34.

The plaintiffs complained that the Texas EPSDT program had failed to provide federally mandated services, and to meet the requirements of 42 U.S.C. §§ 1396a(a)(43) and 1396d(r), various federal regulations, and certain provisions of the

42

State Medicaid Manual. *Id.* at 534.  The plaintiffs specifically alleged that the Texas

EPSDT program:

> (1) did not have policies or procedures to assure that class members receive health, dental, vision, and hearing screens, (2) did not meet annual participation goals set by the Secretary of Health and Human Services, (3) did not effectively inform eligible persons of the availability of EPSDT services, (4) did not employ policies and procedures to provide or arrange for other necessary measures to correct or ameliorate physical and mental conditions discovered by the screening services, (5) did not provide case management services to all EPSDT recipients as needed, and (6) did not provide services uniformly in all political subdivisions of the State.

*Id.*  The district court certified a class consisting of more than one million Texas children

entitled to EPSDT services.

Following extensive settlement negotiations, the plaintiffs and state officials

agreed to resolve their dispute by entering into a consent decree.  *Id.*  After conducting

a fairness hearing, the district court approved the detailed agreement reflected in the

parties' consent decree.  *Id.* at 535.  Approximately two years later, the plaintiffs filed a

motion to enforce the consent decree claiming that the state officials had not complied

with numerous requirements to which they had agreed.  The defendants objected to the

district court's jurisdiction to enforce the consent decree under § 1983, based on

Eleventh Amendment grounds.  Defendants argued that the plaintiffs failed to establish

a violation of federal rights enforceable under § 1983 and that the Eleventh Amendment

rendered the consent decree unenforceable even if statutory noncompliance was

established.  *Id.*  The district court rejected the State's Eleventh Amendment argument

and the defendants appealed.

On appeal, the Fifth Circuit ruled that the Eleventh Amendment prevented

enforcement of the decree unless the violation of the consent decree was also a

43

statutory violation of the Medicaid Act provisions which created enforceable rights under § 1983. *Id.* at 543. It ruled that the lower court had erred by concluding that "in enforcing the consent decree, the court [was] bound solely by its language," and that "an interpretation of the decree must be based strictly on the language of the decree, and not on the legal requirements of the Medicaid Act, except to the extent that those requirements are clearly imported by the language of the decree." *Id.* at 537. The Fifth Circuit then conducted an analysis of the Medicaid provisions and the alleged violations of the consent decree, concluding that none of the purported violations provided a valid basis for enforcement. The *Frazer* court held that without a violation of federal law, the district court lacked jurisdiction to remedy the consent decree. *Id.*

The Supreme Court granted certiorari on this *jurisdictional* question. *Frew v. Hawkins*, 440 U.S. at 436. In resolving a circuit split on the issue, the Supreme Court reversed the Fifth Circuit, holding that the consent decree was enforceable under *Ex Parte Young. Id.* at 436-37. The Court's reversal, however, rested solely on the enforceability of the consent decree by the district court in the face of the Eleventh Amendment. It did not pass on the Fifth Circuit's analysis of whether the Medicaid provisions created enforceable rights or, more importantly, whether such rights under the Medicaid provisions may be remedied by ensuring perfect state compliance. *See id.* It is this undisturbed analysis that is relevant to the case at hand.

Applying the less exacting standard in existence prior to *Gonzaga*, the Fifth Circuit Court of Appeals ruled that the plaintiffs could not sue under § 1983 "to require a plan to meet statewide or systemwide participation or performance measures, because,

under *Blessing*, state compliance with such standards is not an individualized right

actionable under § 1983." *Id.* at 545. As the court explained,

> Although relief under § 1983 for a violation of EPSDT provisions may be available, *perfect state compliance with these provisions is not required*. While a district court should have some discretion to craft an injunction to remedy violation of the Medicaid Act, there are limits on the relief available from a federal court.

> We reach this conclusion based on our understanding of congressional intent. Our goal, of course, in construing a statute is to give effect to congressional intent, and we begin this task by looking to the language of the statute itself.

> In the pending case, the district court did not direct that particular individuals receive EPSDT services to which they were entitled under federal law. It has instead taken upon itself the task of reworking the procedures and mechanisms whereby EPSDT services are provided to the totality of eligible participants. The court has become overseer of the State's Medicaid plan. As such, the court assumes the role of assuring that the State's *plan* meets federal mandates, *which in turn raises the issue of whether the plan must always, unfailingly, provide the EPSDT services described in the Medicaid Act. We think that is not required. Congress did not intend that a court can require that a state participating in the Medicaid program must always provide every EPSDT service to every eligible person at all times. Perfect compliance with such a complex set of requirements is practically impossible, and we will not infer congressional intent that a state achieve the impossible.* Furthermore, looking to § 1396a(a)(43), even though it refers in subpart (A) to providing notice to "all persons," and refers in subpart (B) to the provision of EPSDT screening services in "all cases" where such services are requested, the opening text of § 1396a(a) and § 1396a(a)(43) modify all of this language by only requiring that a state "*plan*" must "*provide for*" meeting these requirements. In § 1396a(b), Congress vested in the Secretary of Health and Human Services (Secretary) the initial responsibility for approving state plans. Section 1396a(a)(43)(D) requires that the state plan provide for reporting certain data including "the State's results in attaining the participation goals set for the State under section 1396d(r) of this title."

> Section 1396d(r) provides:

> > The Secretary shall, not later than July 1, 1990, and every 12 months thereafter, develop and set annual participation goals for each State for participation of individuals who are covered under the State plan under this subchapter in early and periodic

screening, diagnostic, and treatment services.

In § 1396c, the Secretary is authorized to reduce or eliminate, in its discretion, federal funding for state plans which are not in compliance with § 1396a.

In our view, Congress has therefore spoken to the success expected of a state plan: it should meet EPSDT participation goals set by the Secretary. Under the third prong of *Blessing,* these are the only participation goals which are unambiguously imposed on the states. We do not read the statute as allowing a federal district court to require a higher standard of success. Congress did not in our view create such a federal right. Furthermore, under the second prong of *Blessing,* allowing federal courts, which are hardly expert at the intricacies of providing volume health care services to the poor, to choose their own performance goals would in our view render the EPSDT provisions so vague and amorphous as to strain judicial competence.

Moreover, *we believe that plaintiffs cannot sue under § 1983 to require a plan to meet statewide or systemwide participation or performance measures, because, under Blessing, state compliance with such standards is not an individualized right actionable under § 1983.*

. . .

An analogous situation [to the one in *Blessing*] is presented here. The statute authorizes the Secretary to set certain participation goals, and to cut federal funding if "there is a failure to substantially comply" with statutory provisions. Under *Blessing,* a state's failure to meet such a participation goal or other systemwide performance standard does not give rise to individual rights actionable under § 1983. The fact that plaintiffs have pursued their suit as a class action is of no consequence. A class action is merely a procedural device; it does not create new substantive rights and cannot extend the subject matter jurisdiction of the district court.

*Id.* at 544-45 (emphasis added) (footnotes omitted).

The court finds nothing in the statutory text of §§ 1396a(a)(8) or (a)(10) that imposes a requirement for states to compel all potentially eligible individuals to participate. In fact, § 1396a(a)(8) merely requires that "all individuals *wishing to make application* for medical assistance" shall have the "*opportunity*" to do so. 42 U.S.C. §

1396a(a)(8) (emphasis added).  Moreover, the next clause in that section states that "such assistance" (referring back to the "medical assistance" made available to those *wishing* to seek it) "shall be furnished with reasonable promptness . . ."  *Id.*  This second clause does not stand alone and a plain reading of the entire provision does not suggest that the State plan must provide "medical assistance" to every potentially  eligible individual.[7]  As the *Frazer* court aptly noted "some children are unable or, for whatever reason, fail to take full advantage of the services.  The plaintiffs and district court see the answer to be oversight and enforcement by the court.  Aside from the lack of judicial competence to meet this task, we hold that the court lacks jurisdiction to cure the problems or to direct the particular means and methods for this care."  *Id.* at 533.

That the enforceable rights to "medical services" created in those who are eligible and who are denied specific services does not include a right to force the State to ensure 100% participation of every potentially eligible citizen is buttressed by the statutory definition of EPSDT services.  Section 1396a(r) defines "EPSDT services."  It expressly provides that the Secretary of Health and Human Services shall "develop and set annual participation goals for each state for participation of individuals . . . in [EPSDT] services."  42 U.S.C. § 1396a(r).  If Congress gave Plaintiffs federal rights under these Medicaid provisions to force the state to assure 100% compliance with providing "medical assistance" then this language would be rendered superfluous, a

---

[7] Requiring the state to seek and find every potential eligible person for Medicaid would create an unimaginable burden for the State to continually track and update information on millions of people.  This tremendous duty was in no way agreed to by the States in unambigous terms, nor does the language of the text suggest so.  If Congress had intended such a massive undertaking, it would have so stated.

result courts should avoid in interpreting statutes.  *See Smith v. Babcock*, 19 F.3d 257, 263 (6th Cir. 1994).

Plaintiffs do not dispute that the Secretary has set (under § 1396a(r)) an 80% participation goal for EPSDT services.  To the extent that Plaintiffs seek to compel Defendants to provide 100% participation in the provision of EPSDT services to every child in the state who is eligible, they fail to state a claim upon which relief can be granted.  Moreover, there is no *private* enforceable right to ensure that the State "substantially comply" with even the 80% participation goal.  *See Blessing*, 520 U.S. at 343-44.[8]

### 3.  The Provision of EPSDT Services Under 42 U.S.C. § 1396a(a)(43)

Although Plaintiffs did not specifically identify § 1396a(a)(43) in the paragraphs of their amended complaint under the heading "First Cause of Action," they do generally allege a violation of § 1396a(43).  (*See* Pl.'s First Amend. Compl. at ¶ 2.)  This is

---

[8] Other courts have drawn the distinction between enforceable rights under §§ 1396a(a)(8) & (a)(10) that inure in specific covered individuals and purported rights to ensure substantial and complete compliance.  For instance, in *S.D. ex rel Dixon*, the court explained:

"[T]his case is distinguishable from *Frazer v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) . . . .  In *Frazer*, the plaintiffs' claims did not concern any individual recipient's access to services required by federal law.  Rather, the claims concerned the systemwide standards and measures employed by the state Medicaid agency in its administration of the EPSDT program. This court concluded that such generalized standards and procedures do not create individualized rights actionable under § 1983.  In contrast, this case is solely concerned with the right of an individual to a particular service to which he is entitled under federal law.

*Frazer*, 391 F.3d at 604 n.29; *see also Sabree*, 367 F.3d at 181 (plaintiffs were a class of mentally retarded adults in need of covered services under the Medicaid Act, they were qualified for state assistance to obtain those particular services, and such assistance was not forthcoming).

important because the language found in §§ 1396a(a)(43)(B) and (C) must also be examined to determine if individuals have enforceable rights for the provision of EPSDT services via § 1983.  There is no dispute that Plaintiffs are seeking the provision of these services and not merely payment for such services.  In addition, during oral argument, Defendants' counsel acknowledged that the statutory language used in § 1396a(43) was more likely to satisfy the requirements of *Gonzaga*.  The court now turns to the relevant statutory text to determine whether it creates enforceable rights under § 1983 for the provision of certain EPSDT services under certain circumstances.

Section 1396a(a)(43) provides that a state Medicaid plan must,

 . . . provide for–

(A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,[9]

(B) *providing or arranging for the provision of such screening services* in all cases *where they are requested*,

(C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services.

42 U.S.C. §§ 1396a(a)(43)(A)-(C) (emphasis added).

Unlike §§ 1396a(a)(8) and (a)(10), the language used in this section is not limited to "medical assistance."  It focuses on the "providing or arranging for the provision of [ ] screening services where they are requested."  *Id.*  The provision of EPSDT services

_____

[9] Section 1396a(a)(43)(A) is related to notice of EPSDT services for those who have been determined to be eligible.  This provision is the subject of Count III and is examined in more detail below.

under subsection (a)(43)(B) & (C) is not limited to "medical assistance" as that term is defined in § 1396d(a).

As the Supreme Court has stated, a participating State "must have an Early Periodic Screening, Diagnosis, and Treatment (EPSDT) program" under § 1396a(a)(43). *Frew v. Hawkins*, 540 U.S. 431, 433 (2004). In describing the requirements under these provisions, the Supreme Court also explained that "[t]he EPSDT provisions of the Medicaid statute require participating States *to provide various medical services to eligible children*, and to provide notice of the services." *Id.* at 434 (emphasis added). More specifically, the Court noted that "[t]he EPSDT statute requires States to 'provid[e] or arrang[e] for the provision of . . . screening services in all cases where they are requested,' and also to arrange for 'corrective treatment' in such cases." *Id.* (quoting 42 U.S.C. §§ 1396a(a)(43)(B) & (C)).

These provisions focus on all individual children in the State who have been determined to be eligible for EPSDT services and who request such EPSDT services. *See id.* This statutory language is similar to that of § 1396a(a)(8) and (a)(10). Given that the *Wilder* decision remains good law as discussed above, the court finds that § 1396a(a)(43) creates individual rights enforceable under § 1983. The scope of those individual rights is again defined by the text.

Here, the statute provides that a State must provide or arrange for the provision of EPSDT service "in all cases where they are requested." 42 U.S.C. § 1396a(a)(43)(B). Again, this does not create a right to ensure that every child who resides in Michigan and who may be eligible for EPSDT services actually receive these services. *Frazer*, 300 F.3d at 544-45, *rev'd on other grounds*, 540 U.S. 431 (2004).

50

The right is created for those individuals who qualify for and actually request such services.

Plaintiffs have stated a cause of action upon which relief may be granted inasmuch as they allege that the State of Michigan has a policy or practice of not providing the EPSDT services to those eligible children who have in fact requested them.  For instance, Plaintiffs allege that individual Plaintiff K.E., a four-year-old girl, has been denied pediatric dental care.  They allege that "Michigan Medical Assistance has not provided help to this child despite numerous requests by her aunt and mother [and she] is currently on waiting lists of six to eight months for pediatric dental care."  (Pl.'s First Amend. Compl. at ¶ 6.)  As such, part of Count I survives Defendants' motion to dismiss.

### D.  Plaintiffs' Count II "Failure to Deliver Access to the Children's Healthcare Services Required by Title XIX"

In their second count or "cause of action," Plaintiffs allege a violation of 42 U.S.C. § 1396a(a)(30) as defined by 42 U.S.C. § 1396u-2(b)(5).  (Pls.' First Amend. Compl. at ¶¶ 53-59.)  Plaintiffs aver that "Defendants' violation of 42 U.S.C. § 1396a(a)(30)(A) provides a cause of action under 42 U.S.C. § 1983, inasmuch as Defendants, under color of law, custom, or usage, have deprived, are depriving, and have continued to deprive Plaintiffs of their clearly established rights under 42 U.S.C. § 1396a(a)(30)(A), as defined by § 1396u-2(b)(5)."  (*Id.* at ¶ 58.)

Under subsection 30(A), a State plan for medical assistance must,

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary

51

utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A).

Section 1396u-2(b)(5) provides:

Each medicaid managed care organization shall provide the State and the Secretary with adequate assurances (in time and manner determined by the Secretary) that the organization, with respect to a service area, has the capacity to serve the expected enrollment in such service area, including assurances that the organization –

(A) offers an appropriate range of services and access to preventative and primary care services for the population expected to be enrolled in such service area, and
(B) maintains a sufficient number, mix, and geographic distribution of providers of services.

42 U.S.C. § 1396u-2(b)(5).

The courts considering whether § 1396a(a)(30)(A) creates rights enforceable under § 1983 *post-Gonzaga* have also come to conflicting conclusions. *Compare Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 56 (1st Cir. 2004) (no rights creating language); *Sanchez v. Johnson*, 301 F. Supp. 2d 1060, 1063 (N.D. Cal. 2004) ("Section 30(A) addresses the quality of services available to 'the general population in the geographic area,' but does so in indirect terms, too vague to confer an enforceable right upon those providing or receiving services."), *with Clayworth v. Bonta*, 295 F. Supp. 2d 1110, 1123 (E.D. Cal. 2003) ("[I]n Section 30(A) Congress created rights to quality care and equal access that may be enforced by Medicaid recipients under § 1983); *Memisovksi*, 2004 WL 1878332, at *8 ("In light of *Wilder* . . . § 1396a(a)(30)(A) must provide a private right of action enforceable under § 1983).

Unlike the Medicaid provisions cited in Count I, § 1396a(a)(30)(A) does not contain rights creating language or identify an unmistakable focus on eligible participants.  Nor is it akin to § 1396a(a)(13) as interpreted by the Court in *Wilder.*  The court finds persuasive the First Circuit's analysis on the this issue.

Subsection (30)(A), unlike subsection (a)(13) in existence at the time the Court decided *Wilder,* does not focus on a specific objective monetary entitlement for providers similar to the rent-ceiling provision in *Wright.*  Instead, § 1396a(a)(30)(A) "has much broader coverage, sets forth general objectives, and mentions no category of entity or person specifically protected."  *Long Term Care Pharmacy Alliance*, 362 F.3d at 56.  "[N]othing in subsection (30)(A) expressly provides that those who furnish Medicaid services have any enforcement rights or, indeed have any specific rights to procedural [ ] or substantive [ ] protections."  *Id.*

After concluding that *Gonzaga* compelled the circuit court to overturn a prior panel's decision to the contrary, the First Circuit found that § 1396a(a)(30) has no rights-creating language and identifies no discrete class of beneficiaries.  *Id.* at 57.  The *Long Term Care Court* held that Medicaid providers could not sue for violation of subsection (a)(30).  It explained,

> This subsection . . . is not confined to particular services.  Although the statute does not provide any procedure for the determination of such "methods and procedures," implementing regulations for the subsection require public notice of any "significant proposed change" in the "methods and standards for setting payment rates for services," and also opportunity for comment, 42 C.F.R. § 447.205 (2002) (although not necessarily in advance, *see* 46 Fed.Reg. 58,677, 58,678 (Dec. 3, 1981)).  The statute also includes a set of substance goals for the "methods and procedures" including the enlistment of enough providers to furnish service generally available in the community. 42 U.S.C. § 1396a(a)(30)(A) (2000).

The Commonwealth's broadest response is that the pharmacies have no right to sue to enforce subsection (30)(A) or its implementing regulations. Of course, the Secretary of HHS ("the Secretary") can enforce compliance with the provision and implementing regulations already mentioned, in a number of ways-- by disapproving a state plan, 42 C.F.R. § 430.15 (2002), and by cutting off funds, 42 U.S.C. § 1396c (2000); 42 C.F.R. § 430.35 (2002).  By contrast, nothing in subsection (30)(A) expressly provides that those who furnish Medicaid services have any enforcement rights or, indeed, have any specific rights to procedural (*e.g.,* notice and comment) or substantive (*e.g.,* just and reasonable rates) protections.
Private rights of action were once freely inferred from federal statutes that regulated conduct--and here subsection (30)(A) certainly regulates the plan provider--but the ready inference in favor of private enforcement no longer applies. *Compare J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), *with Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), *with Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).  In the past, Long Term's best argument would have been to rely upon section 1983 as providing an explicit automatic private right of action for injunctive relief wherever federal law regulates conduct by a *state* entity[.]

. . .

However, the Supreme Court recently closed that door as well in [*Gonzaga*].  There, the Supreme Court assimilated its earlier cases restricting implied rights of action in non-state cases with section 1983 precedent; it repeated an earlier statement that section 1983 requires a violation of a private federal right and not just a federal *law, id.* at 282-83, 122 S.Ct. 2268 (citing *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)); and it indicated that nothing short of "an unambiguously conferred right" could support a claim under section 1983 based on a federal funding statute.  *Id.*

. . .

The criteria [of the text cited] (avoiding overuse, efficiency, quality of care, geographic equality) are highly general and potentially in tension.  And read literally the statute does not make these directly applicable to individual state decisions; rather state plans are to provide "methods and procedures" to achieve these general ends.  42 U.S.C. § 1396a(a)(30)(A) (2000).  Thus, the generality of the goals and the structure for implementing them suggests that plan review by the Secretary is the central means of enforcement intended by Congress.

Prior to *Gonzaga,* whether subsection (30)(A) authorized private rights for providers was a close question; the circuits were split on the issue, and

well reasoned opinions had been written on both sides . . . Whether
*Gonzaga* is a tidal shift or merely a shift in emphasis, we are obligated to
respect it, and it controls this case. [Medicaid] [p]roviders . . . do not have
a private right of action under subsection (30)(A); if they think that state
reimbursement is inadequate--and cannot persuade the Secretary to act--
they must vote with their feet.

*Id.* at 56-59.

This court agrees that the same conclusion is mandated for Medicaid recipients.

Unlike subsections (a)(8) and (a)(10), subsection (a)(30) does not focus on individuals

eligible for services nor reference an identifiable entitlement such as "medical

assistance." The text does not speak directly to a discrete class of beneficiaries. The

language has an aggregate focus as it concerns the quality of services available "to the

general population in the geographic area," not on eligible individuals or particular

services to be provided to those individuals.

Section 1396a(a)(30) refers to unspecified "methods and procedures relating to

the utilization of, and the payment for, care and services under the plan." 42 U.S.C. §

1396a(a)(30). While eligible individuals may fall within the general zone of beneficiaries,

the court cannot conclude that rights creating language exists in subsection (a)(30).

*See Sanchez*, 301 F. Supp. at 1063-64; *see also Bruggeman*, 324 F.3d at 911 (finding

that a similar subsection of § 1396a, the "best interest" provision at subsection (a)(19),

"is insufficiently definite to be justiciable, and in addition cannot be interpreted to create

a private right of action, given the Supreme Court's hostility . . . to implying such rights

in spending statutes.").[10]

---

[10] 42 U.S.C. § 1320a-2 provides that "a provision of this chapter . . . is not
deemed to be unenforceable because of its inclusion in a section of this chapter
requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. §
1320a-2. This provision makes clear that a Medicaid provision requiring action under a

Plaintiffs argue that the court must find that § 1396a(a)(30) creates individual rights enforceable via § 1983 because it is constrained by the Sixth Circuit's decision in *Gean v. Hattaway*, 330 F.3d 758 (6th Cir. 2003) and by this court's own prior decision reflected in the court's December 28, 1999 "Order Dismissing Organizational Plaintiffs . . . ." (12/28/99 Order at 13.)

Plaintiffs argue that because the Sixth Circuit found individual rights are created by 42 U.S.C. § 1396a(a)(3), *Gean*, 330 F.3d at 772, this court must make the same finding with regard to § 1396a(a)(30), a similar provision. Section 1396a(a)(3) requires that a state plan for medical assistance "must provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."

The *Gean* decision is not binding for several reasons. First, the decision simply does not address *Gonzaga* and its requirement that Congress unambiguously create individual rights by using rights creating language. *Id.* at 772-73 (merely noting that the "fair hearing" provision benefitted Medicaid recipients). Second, and more importantly, § 1396a(a)(3) specifically identifies "any individual" whose claim is denied. 42 U.S.C. § 1396a(a)(3). This provision is similar to §§ 1396a(a)(8), (a)(10), and (a)(43). As discussed above, § 1396a(a)(30) fails to even mention individual recipients and does not have an unmistakable focus on specific individuals. Further, also unlike § 1396a(a)(30), §1396a(a)(3) is tied to a specific denial of benefits and not amorphous

---

State plan does not foreclose a finding that such provision creates individual rights. It does not, however, resolve the question; the court must still look to the specific text and determine whether Congress unambiguously conferred individual rights. Section 1396a(a)(30) does not.

and normative concepts such as "unnecessary utilization" of care, "efficiency," "economy," and "quality of care."  *See* 42 U.S.C. § 1396a(a)(30).

During the February 2, 2005 hearing, Plaintiffs' counsel also argued that the court's 1999 "Order Dismissing Organizational Plaintiffs . . ." was binding law of the case and requires the court to find that § 1396a(a)(30) creates individual rights in Medicaid recipients enforceable under § 1983.  For support, Plaintiffs quote page 13 of this order where the court stated "Section 1396[a](a)(30)(A) by its terms is clearly intended to ensure that Medicaid recipients have available to them a level of medical care commensurate with that available to the public at-large in a given geographical area.  It is the recipients, and not providers, who are the intended beneficiaries of this section."  (12/28/99 Order at 13.)

The December 28, 1999 decision is not binding law of the case.  The court did not engage (and could not have engaged) in a *Gonzaga* analysis to determine whether § 1396a(a)(30) unambiguously created individual rights.  A finding that Medicaid recipients were the beneficiaries is not enough to find unambiguous congressional intent to confer individual rights in spending clause legislation.  *Gonzaga*, 536 U.S. at 282 (rejecting the argument that federal rights are created by federal statutes so long as Congress "intended that the statute 'benefit' putative plaintiffs").

Because § 1396a(a)(30)(A) does not unambiguously confer individual rights enforceable under § 1983, the court will dismiss Plaintiffs' Count II for failure to state a claim upon which relief can be granted.[11]

---

[11] This conclusion results in the dismissal of Plaintiffs The Michigan Chapter of American Pediatric Dentists and The Michigan Chapter of American Academy of Pediatrics.  Both of these Plaintiffs alleged violations of § 1396(a)(30)(A).  (Pl.'s First

### E.  Count III "Denial of Basic Healthcare Outreach and Information"

In their final count or "cause of action," Plaintiffs assert a claim for violation of rights created by § 1396a(a)(43)(A).  They argue that Defendants have refused or failed to "effectively inform" them of the existence of the "Medical Assistance children's healthcare program, the availability of specific child healthcare services, and related assistance."  (Pls.' First Amend. Compl. at ¶ 62.)

The relevant part of the statutory text of this Medicaid provision requires that a State's plan for medical assistance must

> provide for–
> (A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases . . . .

42 U.S.C. § 1396a(a)(43)(A).

The court finds that this provision creates enforceable rights in the identified persons, for the same reasons that §§ 1396a(a)(8) & (a)(10) create enforceable rights. (*See supra* part III.C.)  Again, it is axiomatic that the scope of these rights is also defined by the text.

Here, enforceable rights inure in plaintiffs "who are under the age of 21 *and who have been determined to be eligible* for medical assistance."  42 U.S.C. § 1396a(a)(43)(A).  The plain meaning of this text does not create a duty on behalf of the State to inform every potential eligible child of the availability of EPSDT services.

_____

Amend. Compl. at ¶¶ 11,12.)

Section 1396a(a)(43)(A), by its own terms, applies to those children who have been determined to be eligible.

This conclusion is further buttressed by other parts of § 1396a(a)(43).  For example, § 1396a(a)(43)(B) requires that a State's plan must provide for "providing or arranging for the provision of such screening services *in all cases where they are requested.*"  42 U.S.C. § 1396a(a)(43)(B) (emphasis added).  Subsection (a)(43)(C) is aimed at corrective treatment "the need for which is disclosed" by the EPSDT services requested under Subsection (a)(43)(B).  *Id.* at § 1396a(a)(43)(C).  Nor does anything in the text suggest congressional intent to create an individualized right to compel a participating State to "effectively" inform all potentially eligible children of the EPSDT services.

During oral argument and in their briefing, Defendants noted that Plaintiffs have failed to allege that a person who has been determined eligible for medical assistance was denied notice of the EPSDT services available.  Plaintiffs did not dispute this during the hearing on February 2, 2005 and the court does not find specific allegations in this regard within the complaint.  Accordingly, the court will grant Defendants' motion to dismiss Count III for failure to state a claim.  If Plaintiffs can, in good faith, and desire to allege that a particular Plaintiff or a class of potential plaintiffs has been determined to be eligible for EPSDT services *and* has not been provided notice of those services under § 1396a(a)(43)(A), they should seek to clarify this allegation by stipulation or motion to amend under Federal Rule of Civil Procedure 15.

**F.  Whether State Officials are Liable for Failures of Private Medical Providers**

Defendants also argue that they cannot be sued if the medical providers which have agreed to contracts with Michigan fail to provide EPDST services in accordance with the requirements of the Medicaid statute.  As discussed above, by participating in the Medicaid program, a state plan must "provide for . . . providing or arranging for the provision of [EPSDT] services in all cases where they are requested."  42 U.S.C. § 1396a(a)(43)(B).  Michigan's plan must therefore provide or arrange for the provision of EPSDT services.  That it may do so by entering into contracts with private providers does not relieve it from this statutory duty and whether its actions, policies, and/or procedures satisfy this requirement is a factual issue that may be explored during discovery.  Further, whether the cause of a particular individual's wrongful denial of services is attributable to the state is also a factual issue.

**G.  Defendants' Motion for Summary Judgment**

The court will deny without prejudice Defendants' motion for summary judgment. Formal discovery has not yet commenced in this case and this order will serve to limit the various areas for discovery.  Defendants may file a renewed Rule 56 motion after the parties have had sufficient time to examine this order and begin discovery.  The court, by separate order, will schedule a status/scheduling conference to discuss a Rule 16 case management scheduling order consistent with this opinion.

**IV.  CONCLUSION**

IT IS ORDERED that Defendants' "Motion to Dismiss and/or [for] Summary Judgment" [Dkt. # 89] is GRANTED IN PART and DENIED IN PART.

Defendants' motion to dismiss pursuant to Rule 12(b)(6) is GRANTED with respect to Counts II and III.  It is DENIED with respect to Count I as explained in detail above.

In summary, Plaintiffs have failed to state a claim to the extent that they alleged failure by Defendants in their official capacity to ensure the actual provision of, or arrangement for, medical services.  The scope of rights to "medical assistance" under §§ 1396a(a)(8) and 1396a(a)(10) does not include the provision of actual medical services; nor does it include a right to force Defendants to ensure 100% participation by all potentially eligible individuals.  However, the Plaintiffs who have been determined to be eligible for EPSDT services and who have requested them, have stated a claim to enforce rights created by § 1396a(a)(43).

Defendants' motion for summary judgment pursuant to Rule 56 is DENIED

WITHOUT PREJUDICE.


 s/Robert H. Cleland
____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  April 22, 2005


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 22, 2005, by electronic and/or ordinary mail.


 s/Lisa G. Teets
Case Manager and Deputy Clerk
(313) 234-5522